UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
RACQUEL BRYANT,                                           :
                                  Plaintiff,              :   **MEMORANDUM**
                                                          :   **DECISION AND ORDER**
              - against -                                 :
                                                          :   16 Civ. 5131 (BMC)
REGO ENTERPRISES, LLC doing business                      :
as DALLAS BBQ, GREG WETANSON, and                         :
ALEJANDRO HERRERA                                         :
                                                          :
                                  Defendants.             :
----------------------------------------------------------X

**COGAN,** District Judge.

Plaintiff has brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1983, 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301 ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 to 8-703 ("NYCHRL"), against Rego Enterprises, LLC doing business as Dallas BBQ ("REL"), Greg Wetanson, the owner of REL, and Alejandro Herrera, a former manager at Dallas BBQ, arising from the alleged assault and battery, sexual harassment, gender discrimination, and hostile work environment caused by defendant Herrera.

The case is before me on the motion for summary judgment of REL and Wetanson (the "REL defendants").[1] The REL defendants argue that plaintiff's action is barred by the release she signed in connection with her departure from her employment and the severance package she received. Thus, although plaintiff's complaint is one sounding in civil rights, the issue before me is one of contract. For the reasons that follow, the REL defendants' motion is granted.

---

[1] Defendant Herrera has not appeared in this matter. A review of the docket shows no certificate of service. It has been over 90 days from the filing of the complaint, which means plaintiff has failed to timely effect service under Federal Rule of Civil Procedure 4(m). The claims against him are dismissed.

**BACKGROUND**

The following facts are taken from the parties' Local Rule 56.1 statements, specifically the facts that the parties have deemed undisputed. I have noted where there are disputes.

Plaintiff had been employed as a manager overseeing customer service at the Rego Park branch of Dallas BBQ. On May 19, 2016, she was completing her work in an office in the Rego Park branch when defendant Herrera groped her buttocks. Plaintiff made an internal complaint regarding the incident on May 27. She spoke with a few individuals after making the complaint, including Wetanson.

During a meeting on June 2 with Eric Levine, the Director of Human Resources of REL, and Wetanson, plaintiff advised them that she did not wish to continue working for Dallas BBQ following the incident with Herrera. What followed in the days between June 3 and June 9 were conversations between plaintiff and Levine negotiating her departure from Dallas BBQ.[2]

On June 3, Levine received an e-mail from plaintiff in which she stated: "Starting today, I will take my vacation and look forward to discussing a golden parachute." The next day, plaintiff emailed Levine and summarized the events giving rise to the current situation; in relevant part, she summarized the previous day in the following way: "The next day, June 3, 2016, I called Greg Wetanson and proposed that I use my earned vacation days and within that time, maybe they can consider a severance package because of the circumstances and my discomfort of working due to the sexual offense crime."

On June 5, plaintiff and Levine spoke on the telephone about a severance package, a conversation that was recorded. During the phone call, plaintiff and Levine spoke about

---

[2] Curiously, in plaintiff's response to defendant's Local Rule 56.1 statement, she denies the statement of fact that "[she] and Levine negotiated the terms of her severance agreement and debt forgiveness between June 3, 2016 and June 9, 2016," but she admits each and every succeeding statement of fact that comprised the negotiations.

compensation. Plaintiff and Levine spoke again that next day on June 6 via telephone. During that conversation, which lasted nearly 23 minutes, the following was stated:

> Plaintiff: And I do not, I don't want to take legal action against the company. I don't want to. That's why I'm putting everything on the table so we can bow out gracefully and we can tap out gracefully.
>
> \* \* \*
>
> Plaintiff: Okay. It's a lawsuit, Eric. It's a very serious lawsuit. It's a lawsuit not only of sexual harassment and discrimination – for the mere fact that I'm over 40 years old in the workplace and the proper channels weren't taken – it's a very serious lawsuit, and I'm just gonna be very honest. And I don't want to do that…
>
> \* \* \*
>
> Plaintiff: Are you aware of like what the purpose of a severance package or a golden parachute is? Are you aware of the concrete definition, what it's in place for?
>
> Levine: A severance package is when you leave a job and sometimes you get one week per year or two weeks per year, depending on the situation.
>
> Plaintiff: Okay, that's a severance package; a golden parachute is for management.
>
> Levine: You use that term golden parachute; we're not using that term. This is not lotto, nobody's using that term –
>
> Plaintiff: No, I'm I'm –
>
> Levine: You're using that term.
>
> Plaintiff: No, but it's a term. Just like a severance package. It's a, it's a, it's an escalated version of a severance package in situations [inaudible] in situations that are similar to mine where there is a possibility of legal action being taken or there is a merger or there is some type of company buyout, but it's some significant situation where it would be better for the employee and the employer to part ways, okay? And then I would then, therefore, forfeit my right to take legal action –
>
> Levine: I got you. I got you. We're on the same page. We're talking [inaudible] Go on.
>
> Plaintiff: So now. Okay, so now – if I have the ability and I have all the credibility to sue the company for an excess of maybe 7, 8, 9 million, which I could very easily win –

3

>Levine: Okay.

>Plaintiff: I don't want to do that. So, therefore, I ought to resort to a golden parachute. And I say you know what, I would be satisfied with about $250,000 to $300,000.

After that, Levine stated to plaintiff that they were not on the same page in terms of pay-out, and plaintiff ultimately reduced her figure, stating, "I won't sell myself short. I won't. . . . I will not settle for 20 weeks. I need at least a whole year's salary." Levine then asked plaintiff if she would need benefits, then stating that she is going to need COBRA benefits given the fact that she is a parent and that benefits are expensive. Thereafter, plaintiff stated that she wanted benefits to be part of her severance package.

Plaintiff and Levine spoke again that next day on June 7 via telephone. Levine updated plaintiff on the status of his negotiations with upper management regarding the terms negotiated during their previous day's phone call. He told her that he had negotiated for her six months' salary and six months of benefits. Plaintiff then asked whether there would be loan forgiveness, as plaintiff had borrowed money from several individuals, amounting to over $7,800.

Plaintiff and Bryant spoke again later on June 7 via telephone. During that conversation, the following was stated:

>Plaintiff: . . . My hope was that, you know, initially if I could at least get like a year's salary, you know, and I see that that's not – we're not in the same ball park. Um. Just taking into consideration that we aren't meeting on those ends, can we do it – let's say $30,000 net.

>Levine: $30,000 net. Could I call the CFO and talk about that? Okay?

>Plaintiff: That's fine. Yeah. That's fine.

Plaintiff and Levine spoke again the following day on June 8 by telephone. During that conversation, plaintiff sought an update on when she would see a draft of a letter memorializing

4

their agreement. Levine responded, "Oh yeah, no problem, we made the deal yesterday. I have it being written up." Plaintiff then asked for the letter to include a term for the money to be wired into her account: "Okay, can we draft in the letter for it to be wired into my account?"

Plaintiff and Levine spoke again the following day on June 9 by telephone. In relevant part, plaintiff asked whether the money could be wired into her account by June 16.

The following day, on June 10, Levine met plaintiff and her husband at a Starbucks, during which time he provided her with the Severance Agreement and General Release (together, the "Agreement"). Plaintiff denies receiving the whole Agreement at that precise moment; instead, she avers that she was only shown the first and last pages and did not review the entire Agreement before signing.

The Severance Agreement outlined the following terms of plaintiff's departure from her employment at Dallas BBQ:

> severance pay in the total amount of Thirty Five Thousand Eight Hundred Fifty Two and 08/100 Dollars ($35,852.08), less normal tax and payroll deductions. The net amount to be paid to you will be $30,000. Also, you are relieved from repaying the salary advances from petty cash totaling $2,290. You understand and acknowledge that all rights and claims waived and released herein are in exchange for these payments and other consideration provided in this Agreement to which you otherwise would not be entitled and which are greater than benefits normally given by the Company to terminated employees.

This language appears on the first page of the Agreement, which plaintiff admits she received prior to signing the Agreement's signature page.

The Severance Agreement had a general release clause, which stated, in relevant part that, that plaintiff "agree[s] to execute and be bound by the terms of the General Release annexed to and made a part of this Agreement," and that she "understand[s] the payments and benefits provided in this Agreement are made in consideration of the waiver and release of claims as provided in the General Release." Plaintiff denies seeing this language before signing the

Agreement, asserting that she was only given the first and last pages of the Agreement, and this language appears on the second page of the Agreement.

The Severance Agreement also contained a representations and acknowledgement clause, where plaintiff warranted that she "carefully read and understand[s] the provisions of this Agreement and the incorporated General Release." Plaintiff denies seeing this language before signing the Agreement, again alleging that she was only given the first and last pages of the Agreement, and this language appears on the second page of the Agreement.

On the last page of the General Release, which plaintiff admits she received (of course she must admit this, as the last page is the signature page), the following paragraph appears in all capital letters above where plaintiff signed her name:

> RELEASOR ACKNOWLEDGES SHE FULLY UNDERSTANDS THE CONTENTS OF THE LETTER AGREEMENT AND GENERAL RELEASE AND EXECUTES THEM FREELY AND VOLUNTARILY, WITHOUT DURESS, COERCION OR UNDUE INFLUENCE. THIS RELEASE AND THE LETTER AGREEMENT MAY BE REVOKED WITHIN SEVEN (7) DAYS FOLLOWING THEIR EXECUTION AND THEY SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE SEVEN (7)-DAY REVOCATION PERIOD HAS EXPIRED. RELEASOR FURTHER ACKNOWLEDGES SHE HAS HAD SUFFICIENT TIME AND OPPORTUNITY PRIOR TO SIGNING THE GENERAL RELASE [sic] AND LETTER AGREEMENT TO CONSIDER THEIR CONTENT AND IMPLICATIONS AND TO CONSULT WITH ANYONE OF HER CHOOSING INCLUDING AN ATTORNEY.
>
> IN WITNESS WHEREOF, RELEASOR has signed this General Release this 10th day of June, 2016.

On that same day, plaintiff was given her loan forgiveness letter, on which she wrote comments: "BRENDA $3395;" "KEITH IRUNR - 710.00;" "SHAQ - $200.00;" "JOHN BRUNO - $80.00;" "PETTY CASH - 2290.00 (QUEENS);" and " "___" [likely meant to denote same as above, that is, 'PETTY CASH'] 1145 - (BRONX) - COOP CITY." Plaintiff avers that

she wrote the comments at the insistence of Levine, but in any regard, the tabulation of these figures indicate loan forgiveness valued at over $7800.

On that same day, plaintiff sent an email to Levine, stating: "Please waive my wait period of 7 days and deposit funds into account as soon as possible. Regards, Racquel Bryant." Plaintiff admits that she sent the email, but avers that she did so at the instruction of Levine. In an e-mail plaintiff sent five days later, she stated: "Gentlemen, I wish this all didn't happen. I really appreciate the life experience the company has given. I wish you all the best. Yours Truly, Racquel."

The payment agreed to by the parties was directly deposited into plaintiff's bank account on June 16, 2016. Five days after receiving the funds via direct deposit and eleven days after signing the Agreement, plaintiff sent an email stating the following: "This serves as formal notice to the company that today June 21, 2016, I Racquel Bryant am revoking the General Release and Waiver and Agreement signed June 10, 2016." Levine informed plaintiff that she was too late.

Prior to commencing this action, plaintiff filed a charge of employment discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging circumstances of discrimination based on sex and retaliation. The EEOC issued a right to sue letter, and plaintiff commenced this action.

## DISCUSSION

"[S]ummary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In determining whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135

(2d Cir. 2013) (alteration, citations, & internal quotation marks omitted). In ruling on a motion for summary judgment, a district court "may rely on any material that would be admissible at a trial." Lyons v. Lancer Ins. Co., 681 F.3d 50, 57 (2d Cir. 2012) (quotation marks omitted); see also Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., 635 F.3d 48, 52 (2d Cir. 2011) ("[T]he non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ." (internal quotation marks omitted)). A dispute is not "genuine" if no reasonable jury "could return a verdict for the nonmoving party." Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).

I. **The Agreement Is Valid**

Plaintiff does not dispute that she signed the Agreement, which includes a waiver of her claims under Title VII. Instead, she attacks her execution of the Agreement as having been made without sufficient knowledge. "[A] release is a species of contract law and 'is governed by the principles of contract law.'" Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 514 (2d Cir. 2001) (quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. Gallizeau, 766 F.2d 709, 715 (2d Cir. 1985)). "'Where the language of a release is clear, effect must be given to the intent of the parties as indicated by the language employed.'" Wang v. Paterson, No. 07-2032, 2008 WL 5272736, at *4 (S.D.N.Y. Dec.18, 2008) (quoting Shklovskiy v. Khan, 273 A.D.2d 371, 372, 709 N.Y.S.2d 208, 209 (2d Dep't 2000)). Under New York law, "[a] release will not be treated lightly, and will be set aside by a court only for duress, illegality, fraud, or mutual mistake." Rivera v. Sovereign Bank, 976 F. Supp. 2d 270, 286 (E.D.N.Y. 2013) (quoting Shklovskiy, 273 A.D.2d at 372, 709 N.Y.S.2d at 209 (internal quotation marks omitted). "A natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby unless he is

(a) under guardianship, or (b) an infant, or (c) mentally ill or defective, or (d) intoxicated." Restatement (Second) of Contracts § 12(2).

Here, there are no allegations of duress, illegality, fraud, mutual mistake, or any incapacity on the part of plaintiff, like mental illness or intoxication. Instead, plaintiff argues that she was not given a chance to read the entire Agreement before signing and did not know the rights she was releasing, and then somehow that she only got around to reading the Agreement in full eleven days after signing it, well after the seven days she had to revoke the Agreement and after she received the money that she negotiated as part of her severance package.

In her opposition, plaintiff argues that she did not know what she was signing away and that she was not told she was waiving her right to sue. In the hopes of arguing something akin to incapacity, plaintiff makes the following averments in her affidavit: (i) that human resources never informed her that she was waiving her rights to litigate her claims nor that she should consult with an attorney prior to signing the Agreement; (ii) that she did not receive the entire Agreement prior to her executing it; (iii) that she only had five minutes to review the documents before signing, and (iv) that she did not understand the significance of the seven-day revocation period.

The facts of this case belie plaintiff's averments, and no reasonable jury could find otherwise. In fact, plaintiff's own recorded statements show her sworn statements in opposition to this motion to be affirmatively false. First, plaintiff made several statements that reflect a keen awareness and understanding that she was negotiating a severance package consisting of cash and benefits in return for the waiver of her legal rights. I need not repeat them all as they are set forth above, but one excerpt mandates the conclusion that plaintiff knew what she was doing. Plaintiff raised the term "golden parachute," which Levine was unaware of, and plaintiff

explained that it is "an escalated version of a severance package . . . in situations that are similar to mine where there is a possibility of legal action being taken . . . where it would be better for the employee and the employer to part ways, okay? And then I would then, therefore, forfeit my right to take legal action." It is baffling that plaintiff avers in her affidavit that she did not know she was releasing her legal rights when it was she that raised the "golden parachute" and defined it as the *quid pro quo* for a forfeiture of the right to bring a legal action.

"[A] self-serving, contradictory affidavit fails to raise a triable issue of fact when it conflicts with documentary evidence." Christiana Bank & Trust Co. v. Dalton, No. 06-CV-3206, 2009 WL 4016507, at *4 (E.D.N.Y. Nov. 17, 2009); Dzanoucakis v. Chase Manhattan Bank, USA, No. 06-CV-5673, 2009 WL 910691, at *8 (E.D.N.Y. Mar. 31, 2009) (where the "uncontroverted record clearly supports a [particular] finding," then "[p]laintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact"). I cannot credit plaintiff's self-serving affidavit in the face of overwhelming evidence of entirely contradictory statements by plaintiff, because if a jury were to credit such testimony, I would have to find that verdict unreasonable and set it aside. Plaintiff had a clear understanding as to the terms of her severance package; she negotiated the terms with an eye towards the forfeiture of her legal rights, and she did not need Human Resources to inform her of a fact that her own statements prove that she already knew.

With respect to her attempts to excuse her failure to timely revoke the Agreement, those averments are also unavailing. Plaintiff now avers that she did revoke the contract on the seventh business day after signing it. As an initial matter, the Court notes that during the pre-motion conference, plaintiff provided an entirely different reason in favor of her having made a timely revocation: She stated that she thought the revocation period was seven days from receipt

of payment, which occurred on June 16, making her June 21 revocation timely. In opposition to the motion, in contrast, she has sworn that in fact she thought the revocation period was seven business days from signature, which also would make her revocation timely. But her excuses beg the question. She cannot contend that she did not understand the significance of a revocation period, but also argue that she thought she was complying with the revocation period.

Finally, plaintiff had seven full days with the Severance Agreement and General Release. Her arguments predicated on the alleged brief five minutes she had before execution or that she only saw the first and last pages fall flat because of those seven days. She had the time to read the Agreement, which is only seven pages, five pages comprising the Severance Agreement and two pages comprising the General Release.

## II. Plaintiff Knowingly and Voluntarily Released her Discrimination Claims Under Federal Law

The analysis does not end there, however. The particular release of her discrimination claims triggers additional analysis under federal law: The effectiveness of a release of a claim of employment discrimination under Title VII depends on whether the employee's release was "voluntary and knowing." Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.15, 94 S. Ct. 1011 (1974); Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438 (2d Cir. 1998). To determine whether plaintiff's release was given voluntarily and knowingly, the Second Circuit uses a "totality of circumstances" test. Livingston, 141 F.3d at 438. Courts consider several factors in this analysis, including:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

Livingston, 141 F.3d at 438 (internal quotation marks omitted). Applying the Livingston factors to the facts here establishes that plaintiff's release of her Title VII claims was voluntary and knowing.

The first factor favors validity of the release because plaintiff has sufficient education and business experience to understand the Agreement. Plaintiff is a graduate of the University of Illinois – Urbana with a degree in speech communications. She had previously worked in the pharmaceutical industry as a saleswoman before her term as a manager at Dallas BBQ. This demonstrates that plaintiff is educated and has business experience.

The second factor also favors validity because as discussed above, plaintiff had access to the Agreement for seven days before she had to revoke it, irrespective of the time she had before signing the Agreement.

The third factor also favors validity. Even though the Agreement was drafted and provided by the REL defendants, plaintiff had significant input into the terms of the Agreement. She spoke with an agent of the REL defendants almost every day between June 3 and June 9, negotiating the cash amount, benefits, and loan forgiveness.

The fourth factor favors validity, as well, because the Agreement and the release of discrimination claims are clear. The Agreement in multiple places clearly stated that plaintiff was releasing her employer of liability. Further, the General Release specifically references federal and state employment discrimination statutes and was only two pages long, seven pages for the whole Agreement.

The fifth factor does not favor validity because plaintiff was not represented by counsel, but this factor does not help her because she had ample opportunity to consult with an attorney, either while she was negotiating the terms of her severance or in the seven-day revocation period

during which she had the Agreement, and there is nothing so complicated about this agreement, or, as shown above, so unsophisticated about this plaintiff that an attorney's advice was essential to her understanding.

Finally, the sixth factor also favors validity of the Agreement, as plaintiff was not entitled to severance pay, and the Agreement was clear on this fact. The Agreement is unequivocal: "You understand and acknowledge that all rights and claims waived and released herein are in exchange for these payments and other consideration provided in this Agreement to which you otherwise would not be entitled and which are greater than benefits normally given by the Company to terminated employees."

**III. Plaintiff Knowingly and Voluntarily Released her Discrimination Claims Under State and Municipal Law**

Similar to its federal counterpart, in evaluating a waiver of claims of employment discrimination, New York law looks at whether a release is "knowingly and voluntarily entered into," as well as whether the agreement is "clear and unambiguous on its face." Skluth v. United Merchants & Mfrs., Inc., 163 A.D.2d 104, 106, 559 N.Y.S.2d 280, 282 (1st Dep't 1990). This analysis applies to plaintiff's waiver of her claims under NYSHRL and NYCHRL. See e.g., Johnson v. Lebanese Am. Univ., 84 A.D.3d 427, 922 N.Y.S.2d 57 (1st Dep't 2011) (applying Skluth to claims under both NYSHRL and NYCHRL but finding the waiver invalid). However, rather than looking at the "totality of the circumstances," New York law relies on principles of contract law, a standard that is less stringent than the one that applies to the waiver of discrimination claims under federal law. See e.g., Livingston v. Bev-Pak, Inc., 12 F. Supp. 2d 242 (N.D.N.Y. 2000).

As has already been discussed, under contract principles, plaintiff is bound by the release she signed. She pleaded no fraud, mutual mistake, duress, or illegality, nor any form of

incapacity. Moreover, because the federal "totality of the circumstances" analysis is more stringent and because her release was knowing and voluntary under the more stringent analysis, it follows that her release would be knowing and voluntary under New York law. See, e.g., Loksen v. Columbia Univ., No. 12 CIV. 7701, 2013 WL 5549780, at *6 (S.D.N.Y. Oct. 4, 2013) (dismissing state law employment discrimination claim after finding release of federal claims satisfied the totality of circumstances test).

In sum, "[g]iven the clear and unambiguous language contained in the General Release; the strong public policy in favor of enforcing such a release; and the absence of any allegations indicating that the General Release was a result of duress, illegality, fraud, or mutual mistake," the terms of the General Release will be upheld. See Lambertson v. Kerry Ingredients, Inc., 50 F. Supp. 2d 163, 170 (E.D.N.Y. 1999).

## CONCLUSION

The REL defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment, dismissing the complaint against REL and Greg Wetanson with prejudice and without prejudice as to Herrera.

**SO ORDERED.**

U.S.D.J.

Dated: Brooklyn, New York
December 23, 2016